UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

| | |
|---|---|
| THOMAS SCHILLING,<br><br>*PLAINTIFF,*<br><br>*-against -*<br><br>3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BASF CORPORATION, individually, and as successor in interest to Ciba Inc., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., CLARIANT CORPORATION, individually, and as successor in interest to Sandoz Chemical Corporation, CORTEVA, INC., DUPONT DE NEMOURS, INC., DYNAX CORPORATION, E.I. DU PONT DE NEMOURS AND COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, L.L.C., and TYCO FIRE PRODUCTS L.P.,;<br><br>*Defendants.* | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

PLAINTIFF THOMAS SCHILLING ("PLAINTIFF"), by and through undersigned attorneys, Morgan & Morgan, P.A., as and for its complaint against Defendants 3M Company, f/k/a Minnesota Mining and Manufacturing Co., BASF Corporation, Buckeye Fire Equipment Company, Chemguard, Inc., Clariant Corporation, Corteva, Inc., DuPont de Nemours, Inc, Dynax Corporation, E.I. du Pont De Nemours and Company, National Foam, Inc., The Chemours Company, The Chemours Company FC, L.L.C., and Tyco Fire Products L.P. (collectively "Defendants"), allege as follows:

## I. INTRODUCTION

1.     PLAINTIFF is a FIREFIGHTER who serving the INDIAN RIVER COUNTY FIRE RESCUE in VERO BEACH, FLORIDA from 2008 to PRESENT.

2.     PLAINTIFF brings this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

3.     PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, inter alia, resist and repel oil, stains, heat and water. PFAS include "long-chain PFAS" made up of seven or more carbon atoms as well as "short-chain PFAS" made up of six or fewer carbon atoms.

4.     PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion, and dermal contact.

2

5.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.  PFAS have also been found to concentrate in human blood, bones, and organs.

6.     Unbeknownst to PLAINTIFF, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in Class B firefighting foams ("Class B foam") and in protective clothing specifically designed for firefighters ("turnouts").

7.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock, as well PFAS-containing Class B foam and turnouts, to firefighting training facilities and fire departments nationally, including in FLORIDA. Defendants did so, moreover, without ever informing firefighters or the public that their Class B foams and turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

8.     The FIREFIGHTER PLAINTIFF wore turnouts and used Class B foam in the usual and normal course of performing their firefighting duties and training.  PLAINTIFF did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-containing materials.  Instead, at all relevant times and continuing to the present, Defendants represented their Class B foams and turnouts as safe.

9.     The FIREFIGHTER PLAINTIFF used the Class B foam and turnouts as they were intended and in a foreseeable manner which exposed them to PFAS in the course of their firefighting activities. This repeated and extensive exposure to PFAS resulted in TESTICULAR

CANCER and other serious and life-threatening diseases to the FIREFIGHTER PLAINTIFF. PLAINTIFF's PFAS exposure continues to pose a significant threat to their personal health due to PFAS persistence, pervasiveness, toxicity, and bioaccumulation.

10. PLAINTIFF was diagnosed with TESTICULAR CANCER in MAY 2015, by DR. TARDIFF in VERO BEACH, FLORIDA.

11. Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the STATE of FLORIDA when they knew or reasonably should have known that the FIREFIGHTER PLAINTIFF would repeatedly inhale and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

12. PLAINTIFF brings this action against Defendants and seeks damages, together with any appropriate injunctive or other equitable relief.

## II. PARTIES

## PLAINTIFF

13. PLAINTIFF is a FIREFIGHTER who serving the INDIAN RIVER COUNTY FIRE RESCUE in VERO BEACH, FLORIDA from 2008 to PRESENT. In the course of firefighting training and fire suppression activities, PLAINTIFF routinely used Class B foam and wore turnouts that, unbeknownst to PLAINTIFF, contained PFAS or PFAS-containing materials. PLAINTIFF was unaware that the Class B foam used and the turnouts worn contained PFAS or PFAS-containing materials. PLAINTIFF has been diagnosed with, and is being treated for, TESTICULAR CANCER.

14.    The PLAINTIFF alleges that PFAS or PFAS-containing materials developed, manufactured, marketed distributed, released, sold, and/or used by Defendants in Class B foam and turnouts, as herein alleged, caused them to be exposed to PFAS and/or PFAS-containing materials. Such exposure was a substantial factor and proximate cause of the TESTICULAR CANCER, serious illnesses, bodily injuries, and emotional injuries suffered by the PLAINTIFF, as alleged herein.

**Defendants**

15.    Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M does business throughout the United States, including conducting business in FLORIDA. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires throughout the country.

16.    Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, on or about 2008, BASF acquired Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) and is the successor-in-interest to Ciba, Inc. BASF does business throughout the United States, including conducting business in FLORIDA. At all times relevant, BASF manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

17.    Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in FLORIDA. At all times relevant, Buckeye Fire

manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

18.     Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard does business throughout the United States, including conducting business in FLORIDA.  At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

19.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.  Clariant does business throughout the United States, including conducting business in FLORIDA.  At all times relevant, Clariant manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

20.     On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

21.     Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products, including fluorosurfactants for Dynax.

22.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware. Corteva Inc. does business throughout the United States, including conducting business in FLORIDA.  At all times relevant, Corteva manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

23.    Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

24.    On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

25.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

26.    Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in FLORIDA.  At all times relevant, DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

27.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont).  New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

28.    Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in FLORIDA.  Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.  At all times relevant,

Dynax manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

29. Defendant E.I. du Pont De Nemours & Co. ("E.I. Dupont") is a Delaware Corporation and does business throughout the United States, including conducting business in FLORIDA. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. At all times relevant, E.I. du Pont De Nemours & Co. manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

30. Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501. National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products. National Foam does business throughout the United States, including conducting business in FLORIDA. At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

31. Defendant The Chemours Company is a Delaware Corporation and conducts business throughout the United States, including conducting business in FLORIDA. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. At all times relevant, The Chemours Company manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

32. Defendant The Chemours Company FC, LLC, is a Delaware Corporation and conducts business throughout the United States, including conducting business in FLORIDA. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. At all times

relevant, The Chemours Company manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

33.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

34.     Defendant Tyco Fire Products, LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin.  Tyco does business throughout the United States, including conducting business in FLORIDA. At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires throughout the country.

35.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. du Pont De Nemours & Co. and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

36.     Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

37.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

38.    3M, BASF, Buckeye Fire, Chemguard, Clariant, Corteva, DowDuPont Inc., Dynax, E.I. Dupont, National Foam, Chemours, and Tyco are collectively referred to as "Defendants."

39.    PLAINTIFF alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to PLAINTIFF, as alleged herein.

40.    PLAINTIFF alleges that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled and/or sold within FLORIDA, and that were used by FIREFIGHTER PLAINTIFF within FLORIDA.

41.    Defendants expected or should have expected their acts to have consequences within the STATE of FLORIDA and derived substantial revenue from interstate commerce.

42.    Defendants purposefully availed themselves of the privilege of conducting activities within the STATE of FLORIDA, thus invoking the benefits and protections of its laws.

43.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

44.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

### III.    JURISDICTION AND VENUE

10

45.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the PLAINTIFF and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

46.     PLAINTIFF is direct-filing this Complaint in the United States District Court for the District of South Carolina as permitted by Case Management Orders Nos. 3D & 3E entered by this Court in In Re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG.

47.     PLAINTIFF has served as FIREFIGHTER for OVER 16 YEARS in INDIAN RIVER COUTNY, FLORIDA at all times relevant to exposure to AFFF.

48.     The United States District Court for the SOUTHERN DISTRICT OF FLORIDA is the proper venue of origin where PLAINTIFF's claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

49.     The United States District Court for the SOUTHERN DISTRICT OF FLORIDA is the proper "Home Venue" because, based on information and belief, each Defendant is a corporation or other business that has sufficient minimum contacts in FLORIDA or otherwise intentionally avails itself of the FLORIDA market either through the distribution or sale of AFFF products in the State of FLORIDA so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

50.     Further, Venue is also proper in the United States District Court for the SOUTHERN DISTRICT OF FLORIDA under 28 U.S.C. § 1391(b)(2) because the events, omissions, and harms that are the basis of PLAINTIFF's claims occurred in substantial part in this judicial district.

51. PLAINTIFF brings causes of action based solely on and arising under FLORIDA law. The claims of PLAINTIFF are for violations of FLORIDA law that occurred exclusively in the STATE of FLORIDA.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. FIREFIGHTER PLAINTIFF'S Use and Exposure to PFAS-Containing Products

52. PLAINTIFF is a FIREFIGHTER who is serving the INDIAN RIVER COUNTY FIRE RESCUE in VERO BEACH, FLORIDA from 2008 to PRESENT.

53. As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, PLAINTIFF risked their life on a daily basis. PLAINTIFF not only saved lives and homes, they provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare for this enormously challenging work, the FIREFIGHTER PLAINTIFF received extensive training in fire suppression (including the preparation and use of Class B foam), fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

54. For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or Class B foam and turnouts containing PFAS to firefighting training facilities and fire departments globally, including within the STATE of FLORIDA.

55. With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia,* resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in Class B foam and firefighter turnouts.

12

**B. PFAS-Containing Class B Foam**

56.     Class B foam is one of the primary tools used by firefighters for fire suppression and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, chemical spills, and Hazmat incidents. Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished.

57.     The most common Class B foam is aqueous film-forming foam ("AFFF").  AFFF and other Class B foams contain PFAS.  Poly- and perfluroalkyl substances (collectively "PFAS compounds") are terms used to describe a group of organic fluorinated alkanes.  PFAS compounds have been used for decades to produce products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

58.     To use Class B foam, a Class B foam concentrate must first be mixed with water.

59.     Class B foam concentrate is typically sold in five-gallon containers that a fire engineer is responsible for storing on the engine and/or pouring into the bladder of engine. To mix the foam concentrate and water in an engine that is not pre-plumbed, an eductor must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, white, foamy substance. The fire engineer is responsible for this process of preparing the foam and for cleaning the equipment (bladders, hoses, nozzles, etc.) after use.

60.     The process of mixing Class B foam, plumbing and preparing it, and cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by the FIREFIGHTER PLAINTIFF and their fire department to mix and prepare the Class B foam for use did not say that

13

the foam contains PFAS and did not warn the FIREFIGHTER PLAINTIFF of the serious health risks associated with exposure to PFAS.

61.     Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment— by being sprayed through a fire hose.

62.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over time.

63.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during.  As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

64.     As alleged herein, the FIREFIGHTER PLAINTIFF used Class B foam in the ordinary course of performing their duties as it was intended to be used and in a foreseeable manner which exposed them to significant levels of PFAS.

65.     The FIREFIGHTER PLAINTIFF did not know, and in the exercise of reasonable diligence, could not have known that the Class B foam they used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used in performing their duties.

66. These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to the FIREFIGHTER PLAINTIFF and continue to pose a significant health threat to them given the bioaccumulation, pervasiveness, and persistence of PFAS.

**C. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

67. There are six long-chain PFAS compounds, which are divided into two sub-categories: (1) long-chain perfluoraoalkyl carboxylic acids (PFCAs) like PFOA, and (2) perfluoroalkane sulfonates (PFSAs), including perfluorohexane sulfonate (PFHxS) and PFOS. PFOS and PFOA compounds are the most toxic manmade chemicals of the PFAS family.

68. PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond that is one of the strongest chemical bonds that occurs. PFOS and PFOAs are extremely persistent in the environment and in the human body and have the potential to bioaccumulate and biomagnify in wildlife. Bioaccumulation appears to be related to the length of the C-F chain; as the size of the chain increases, the compound becomes more bioaccumulative.

69. PFOS and PFOA have unique characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFOS and/or PFOA are applied, discharged, disposed of, or otherwise released onto land, those compounds migrate through the subsurface and into groundwater, resist natural degradation, and are difficult and costly to remove from water.

70. PFOA and PFOS contamination presents a significant threat to public health and welfare. PFOA is readily absorbed in the body after consumption or inhalation, and it accumulates

primarily in the blood stream, kidney, and liver. Studies have shown that exposure to fluorochemicals that contain eight carbons or more ("C8"), such as PFOS and PFOA, may cause testicular cancer, kidney cancer, and liver damage in adults, as well as developmental effects to fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty, and skeletal variations.

71. There also have been studies linking C8s with autoimmune and endocrine disorders, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease, and pregnancy-induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOS or PFOA.

72. Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFOS and PFOA in humans.

**D. Defendants' History of Production of PFOA/PFOS and Commercialization of AFFF**

73. 3M began producing PFOA as part of a process called electrochemical fluorination (ECF) in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS.

74. For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been 3M, through its supply of AFFF.

75. In the 1960s, 3M began developing AFFF, which was created to extinguish Class B fires that are fueled by flammable liquid and particularly difficult to fight using traditional methods of extinguishing fires. Class B fires cannot be safely extinguished with water.

76. AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing

16

aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

77.     3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

78.     National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

79.     Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

80.     Dynax began to manufacture, market, and sell the raw materials for production of AFFF in the 1990s and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

81.     Buckeye began to manufacture, market, and sell AFFF in the 2000s.

82.     After its creation in the 1960s and entrance into the commercial market, AFFF was utilized by the Department of Defense and the US Navy to extinguish fuel-based fires during routine military drills. AFFF was also used in hundreds of bases across the country.

83.     Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

84.     In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

85.     In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition ("FFFC").

17

86.     In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

87.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

88.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

89.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

90.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

91.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

92.     After 3M exited the AFFF market, the remaining Defendants continued to manufacture and sell AFFF.

93.     The Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

94.     While the Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use AFFF that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

95.     The Defendants further did not act to remove AFFF from the stream of commerce.

96. The Defendants did not warn the public or firefighters of the health dangers of AFFF, thus the FIREFIGHTER PLAINTIFF did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used in performing their duties.

97. The Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

### 1.     3M's Knowledge of the Dangers of PFAS

98. In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

99. 3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

100. By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

101. 3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment.

102. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

103. As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

104. 3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

105. 3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

106. By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

107. One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

108. In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

109. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

110. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

111. Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

112. In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment.

113. 3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

114. 3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

115. In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

116.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

117.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS.  For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

118.    In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

119.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

120.    On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

121.    3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and contaminate the environment.

122.    Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS."

2.    **Dupont's Knowledge of the Dangers of PFAS**

21

123. DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

124. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

125. In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

126. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

127. By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

128. DuPont did not report this data or the results of its worker health analysis to any government agency or community.

129. The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

130. Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

131. In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

132. While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

22

133.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

134.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

135.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

136.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

137.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

138.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

139.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

140.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

141.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

142.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

143.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment.

### 3.    Other Defendant's Knowledge of the Dangers of PFAS

144.    Tyco/Ansul, Chemguard, Buckeye, Dynax, National Foam/Angus Fire, BASF Corporation, and Clariant Corporation knew, or at the very least should have known, that in their intended and/or common use, their AFFF and/or PFAS products would harm human health and the environment, including causing harm to PLAINTIFF.

145.    Tyco/Ansul, Chemguard, Buckeye, Dynax, National Foam/Angus Fire, BASF Corporation, and Clariant Corporation knew, or at the very least should have known, that their AFFF and/or PFAS products would contaminate PLAINTIFF's public water supply.

146.    Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

147.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

148.    DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

149. All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants").

150. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

151. The FFFC Defendants worked together to protect AFFF from scrutiny.

152. Their close cooperation included messaging on PFOA's toxicological profile.

153. The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

154. FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

155. These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

156. FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

157. FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

158. While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and PLAINTIFF.

**4.     Dupont's Spinoff of Chemours**

159.    In February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary.

160.    In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

161.    At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

162.    Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

163.    Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United Stated Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds. At the time, it was the largest such penalty in history.

164.    DuPont also promised to phase out production and use of PFOA by 2015.

165.    Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

166.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

167. After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

168. Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight-member board of directors of the new public company.

169. The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

170. In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

171. Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

172. Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

173.    Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

174.    Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

175.    Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

176.    In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

177.    The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

178.    The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

179.    As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

180.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

## V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Defective Product – Strict Liability Failure to Warn

181. PLAINTIFF hereby incorporates by reference the allegations contained in paragraphs 1-181 of this Complaint as if they were set forth at length herein.

182. At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

183. At all times relevant to this litigation, Defendants' AFFF and PFAS surfactants for use in AFFF reached their intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

184. As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the foreseeable risks associated with the reasonably foreseeable uses of their products.

185. As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF and/or PFAS surfactants for use in AFFF.

186. Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

187. The generally recognized and prevailing best scientific and medical knowledge at all times relevant demonstrated that the Toxic Surfactants in Defendants' AFFF and/or PFAS surfactants for use in AFFF could cause cancer and/or serious medical injury due to exposure.

29

188.    The Defendants failed to provide warnings of the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in AFFF could result in the diagnosis of TESTICULAR CANCER.

189.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF and/or PFAS surfactants for use in AFFF were inadequate.

190.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

191.    Had Defendants provided adequate instructions and warnings, the PLAINTIFF's exposure to AFFF's toxic and carcinogenic chemicals would have been reduced or eliminated.

192.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF and/or PFAS surfactants for use in AFFF unreasonably dangerous and defective products.

193.    PLAINTIFF could not have reasonably discovered the defects and risks associated with use of Defendants' AFFF and/or PFAS surfactants for use in AFFF.

194.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the PLAINTIFF.

195.    As a direct and proximate result of Defendants' failure to warn against the negative health effects of exposure to their AFFF and/or PFAS surfactants for use in AFFF, the PLAINTIFF has been diagnosed with TESTICULAR CANCER.

196.    As a direct and proximate result of Defendants' failure to warn of the potential for negative health effects of exposure to their AFFF and/or PFAS surfactants for use in AFFF, the PLAINTIFF has and will continue to incur damages related to negative health effects including, but not limited to, medical treatment and emotional injuries.

197. Defendants' distribution of their defective products, despite their knowledge of the defects, was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the PLAINTIFF.

198. Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

WHEREFORE, PLAINTIFF respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Negligent Failure to Warn

199. PLAINTIFF hereby incorporates by reference the allegations contained in paragraphs 1-181 of this Complaint as if they were set forth at length herein.

200. A product is defective when the foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

201. At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

202. At all times relevant to this litigation, Defendants' AFFF and/or PFAS surfactants for use in AFFF reached their intended consumers and users without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

203. As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the foreseeable risks associated with the reasonably foreseeable uses of their products.

31

204.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage, and disposal of their AFFF and/or PFAS surfactants for use in AFFF.

205.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

206.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF and/or PFAS surfactants for use in AFFF were toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions.

207.    Defendants knew or should have known that the chemicals contained in their AFFF and/or PFAS surfactants for use in AFFF would cause negative health effects to PLAINTIFF from exposure to their AFFF and/or PFAS surfactants for use in AFFF.

208.    The Defendants failed to provide warnings of the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in AFFF could result negative health effects to PLAINTIFF.

209.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF and/or PFAS surfactants for use in AFFF were inadequate.

210.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

211.    Had Defendants provided adequate instructions and warnings, the PLAINTIFF's exposure to AFFF's toxic and carcinogenic chemicals would have been reduced or eliminated.

212.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF and/or PFAS surfactants for use in AFFF an unreasonably dangerous and defective product.

213.    PLAINTIFF could not have reasonably discovered the defects and risks associated with the AFFF and/or PFAS surfactants for use in AFFF.

214.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are liable in damages to the PLAINTIFF.

215.    As a direct and proximate result of Defendants' failure to warn against the negative health effects of exposure to their AFFF and/or PFAS surfactants for use in AFFF, the PLAINTIFF has been diagnosed with TESTICULAR CANCER.

216.    As a direct and proximate result of Defendants' failure to warn of the potential for negative health effects of exposure to their AFFF and/or PFAS surfactants for use in AFFF, the PLAINTIFF has and will continue to incur damages related to these negative health effects including, but not limited to, medical treatment and emotional injuries.

217.    Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

WHEREFORE, PLAINTIFF respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

### THIRD CLAIM FOR RELIEF

**Defective Product - Design Defect**

218.    PLAINTIFF hereby incorporates by reference the allegations contained in paragraphs 1-181 of this Complaint as if they were set forth at length herein.

33

219. At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

220. As manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF or chemicals for use in AFFF that were free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with it.

221. Defendants breached that duty because the AFFF and/or PFAS surfactants for use in AFFF that they manufactured, sold or distributed was dangerous to an extent beyond that contemplated by an ordinary consumer when used in its intended and reasonably foreseeable manner.

222. Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

223. Defendants knew or should have known that the Toxic Surfactants contained in their AFFF and/or PFAS surfactants for use in AFFF were toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions.

224. Defendants knew or should have known that the chemicals contained in their AFFF and/or PFAS surfactants for use in AFFF would cause negative health effects to PLAINTIFF from exposure to their AFFF and/or PFAS surfactants for use in AFFF.

225. The risks of AFFF and/or PFAS surfactants for use in AFFF were not obvious to PLAINTIFF.

226. PLAINTIFF could not have reasonably discovered the defects and risks associated with use of AFFF and/or PFAS surfactants for use in AFFF.

34

227. Defendants' AFFF and/or PFAS surfactants for use in AFFF were far more dangerous than an ordinary consumer would expect when used, as designed, in its intended or reasonably foreseeable manner.

228. Defendants' AFFF and/or PFAS surfactants for use in AFFF were, therefore, unreasonably dangerous.

229. Defendants' AFFF and/or PFAS surfactants for use in AFFF were, therefore, defective.

230. As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the PLAINTIFF.

231. As a direct and proximate result of Defendants' manufacture, sale, or distribution of a defective product, the PLAINTIFF has been diagnosed with TESTICULAR CANCER.

232. As a direct and proximate result of Defendants' manufacture, sale, or distribution of a defective product, the PLAINTIFF has and will continue to incur damages related to these negative health effects including, but not limited to, medical treatment and emotional injuries.

233. Defendants' distribution of their defective products, despite their knowledge of the defects, including knowledge that chemicals contained in their AFFF and/or PFAS surfactants for use in AFFF were toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions, was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the PLAINTIFF.

234. Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

35

WHEREFORE, PLAINTIFF respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### Negligence

235.    PLAINTIFF hereby incorporates by reference the allegations contained in paragraphs 1-181 of this Complaint as if they were set forth at length herein.

236.    The Defendants had a duty to manufacture, market, and sell their AFFF and/or PFAS surfactants for use in AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

237.    Defendants knew or should have known that the manufacture of AFFF and/or PFAS surfactants for use in AFFF containing Toxic Surfactants was hazardous to human health and the environment.

238.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF and/or PFAS surfactants for use in AFFF using Toxic Surfactants because it would cause negative health effects to PLAINTIFF from exposure to their AFFF and/or PFAS surfactants for use in AFFF.

239.    PLAINTIFF was a foreseeable victim of the harm caused by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

240.    As a result of Defendants' breach of their legal duties, the PLAINTIFF has been diagnosed with TESTICULAR CANCER.

241.    PLAINTIFF will continue to suffer damages and expenses in the future including, but not limited to, medical treatment and emotional injuries.

242. Defendants' manufacture, marketing, and sale of AFFF and/or PFAS surfactants for use in AFFF, despite their knowledge of the defects, including knowledge that chemicals contained in their AFFF and/or PFAS surfactants for use in AFFF were toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions, was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the PLAINTIFF.

WHEREFORE, PLAINTIFF respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## VI. DAMAGES

243. PLAINTIFF hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

244. PLAINTIFF seeks monetary damages for each violation of the First through Fourth Claims for Relief.  In particular, PLAINTIFF seeks monetary damages:

    a. to compensate PLAINTIFF for medical expenses (past, present, and future);

    b. to compensate PLAINTIFF for emotional injuries (past, present, and future);

    c. for such other monetary damages as are required to fully compensate PLAINTIFF for the losses they have and will continue to suffer as a result of Defendants' conduct;

    d. for delay damages, including pre-judgment and post-judgment interest according to law; and

    e. PLAINTIFF seeks punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

## VII. PRAYER FOR RELIEF

PLAINTIFF THOMAS SCHILLING, seeks judgment against all Defendants for:

1. Compensatory damages arising from PFOA and PFOS exposure via AFFF and/or turnouts:

   (i)   costs of medical diagnosis and treatment related to exposure;

   (ii)  emotional injury from exposure and diagnosis of serious medical conditions resulting from exposure;

   (iii) interest on the damages according to law;

2. Punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future;

3. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4. Prejudgment interest; and

5. Any other and further relief as the Court deems just, proper, and equitable.

## VIII. JURY TRIAL DEMANDED

PLAINTIFF THOMAS SCHILLING demands a trial by jury as to all issues and defenses.

Respectfully Submitted,

Dated: April 22, 2024

   __/s/ Frank Petosa_____
   Frank M. Petosa
   FL Bar No. 972754
   **MORGAN & MORGAN, P.A.**
   fpetosa@forthepeople.com
   8151 Peters Road, 4th Floor
   Plantation, FL 33324
   Telephone: (954) 327-5366
   Facsimile: (954) 327-3018
   Attorney for PLAINTIFF